******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* JEMAL E. BETHEA
### (AC 40429)

Lavine, Sheldon and Bright, Js.

*Syllabus*

Convicted of the crime of falsely reporting an incident in the second degree in connection with the alleged theft of his vehicle, which had been involved in an automobile accident, the defendant appealed to this court. P, a bystander to the accident, had witnessed a white Chrysler 300 drive through an intersection in Hamden and crash with another vehicle before fleeing the scene. P reported the accident, gave a description of the driver and provided the license plate number of the Chrysler to the authorities. Later that day, the defendant reported to the police that his white Chrysler 300 had been stolen from outside the residence of his girlfriend, M, in Wallingford while he was sleeping, and that M had been the last person to use the vehicle when she drove it to a store earlier that day. The next day, the police recovered the defendant's damaged vehicle from a roadside in Wallingford approximately three miles from M's residence. The license plate number of the defendant's recovered vehicle was one digit different from the license plate number P had reported to authorities. Thereafter, the defendant filed an affidavit of vehicle theft with his insurance company, O Co., stating that his vehicle had been stolen while he was sleeping from outside his own residence in North Branford after he and M had returned from the store. The defendant then gave a recorded statement to O Co. in which he stated that his vehicle had been stolen from outside M's residence after he and M had returned from the store together, and he made a number of inconsistent statements to the police. The police obtained a search warrant for M's cell phone records, which revealed that M's cell phone had been in the vicinity of the evading incident on the date and time of that incident, and in the vicinity of the defendant's car the morning it was recovered. *Held:*

1. The evidence was sufficient to sustain the defendant's conviction of falsely reporting an incident in the second degree, as the jury reasonably could have found that the defendant knew that his car had not been stolen at the time he made the theft report to the police; the jury was entitled to conclude that the defendant's inconsistent and evolving statements surrounding the alleged theft of his vehicle, rather than being mere corrections to his story, demonstrated a consciousness of guilt and that the story of the theft was false, as P's description of the driver of the evading vehicle matched the description of M, whose cell phone records placed her at that location at the time of the evading incident and, thus, gave the defendant a motive to fabricate the theft story, and the allegedly stolen car was discovered near M's home and M's cell phone records placed M in the vicinity of the car the morning it was recovered, which supported an inference that the defendant and M staged the abandonment of the allegedly stolen vehicle to support their false report.

2. The defendant's claim that the verdict returned by the jury finding him guilty of falsely reporting an incident in the second degree but not guilty of insurance fraud was legally inconsistent was not reviewable, our Supreme Court having determined previously that claims of legal inconsistency between a conviction and an acquittal are not reviewable.

3. The record was inadequate to review the defendant's unpreserved claim that the search warrant for M's cell phone records and the warrant for his arrest were obtained without probable cause because the police included false information in the affidavits in support of the issuance of those warrants, as the defendant did not challenge the sufficiency of the affidavits to support the warrants at trial, neither affidavit was entered into evidence or placed on the record, and, thus, there was no way to determine what information was included in the challenged affidavits or to evaluate the defendant's claim; moreover, even if the record was adequate to review the claim, it nevertheless failed and lacked merit, as the defendant had no standing to assert his claim because he did not have a reasonable expectation of privacy in M's cell

phone records, and an illegal arrest does not void a subsequent conviction.

4. This court declined to review the defendant's unpreserved claim that the court improperly permitted P to make an in-court identification of M as the driver of the evading vehicle in the absence of a prior nonsuggestive out-of-court identification, as P did not make an in-court identification but merely gave a description of the driver of the vehicle involved in the evading incident, and the defendant's claim, therefore, was not reviewable pursuant to *State* v. *Golding* (213 Conn. 233) because it was not one of constitutional magnitude alleging the violation of a fundamental right; moreover, the defendant's unpreserved claims that that the trial court erred by admitting P's testimony, which he claimed constituted hearsay and was prejudicial, and by admitting his out-of-court statements were also not reviewable under *Golding*, the claims being evidentiary in nature.

5. The defendant could not prevail on his unpreserved claim that the prosecutor improperly withheld the testimony of an alleged eyewitness to the evading incident in violation of *Brady* v. *Maryland* (373 U.S. 83); the evidence at issue was not suppressed within the meaning of *Brady*, as the defendant was aware of the alleged eyewitness, who did not make any statement to the police regarding the evading incident, and had equal access to the alleged eyewitness, as demonstrated by the fact that the defendant independently was able to obtain a statement from that witness at some point after the time of his trial.

Argued October 22, 2018–officially released January 15, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of attempt to commit larceny in the second degree, insurance fraud, and falsely reporting an incident in the second degree, brought to the Superior Court in the judicial district of New Haven, geographical area number seven, and tried to the jury before *B. Fischer, J.*; verdict and judgment of guilty of falsely reporting an incident in the second degree, from which the defendant appealed to this court. *Affirmed.*

*Jemal E. Bethea*, self-represented, the appellant (defendant).

*Lisa A. Riggione*, senior assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Kelly Davis*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The self-represented defendant, Jemal E. Bethea, appeals from the judgment of conviction that was rendered against him, upon the verdict of a jury, on the charge of falsely reporting an incident in the second degree in violation of General Statutes § 53a-180c (a) (1). The defendant was tried under an amended information dated March 2, 2017, in which the state alleged, inter alia,[1] that on or about April 8, 2014, in Wallingford, while knowing the information he reported was false or baseless, he reported to law enforcement an incident that did not in fact occur involving the alleged theft of his motor vehicle, and then, with the intent to injure, defraud or deceive Omni Insurance Group, Inc. (Omni), presented a statement of material fact in support of an insurance claim knowing that the statement contained false or misleading information. Although the defendant's appellate brief is not a model of clarity, we construe his claims on appeal to be (1) that the evidence at trial was insufficient to support his conviction of falsely reporting an incident, (2) that the verdicts in his case, finding him guilty of falsely reporting an incident but not guilty of insurance fraud, were legally inconsistent, (3) that neither the warrant to search and seize the cell phone records of the defendant's girlfriend, who was allegedly driving the defendant's vehicle at the time it was reportedly stolen, nor the warrant for the defendant's arrest in this case was supported by probable cause, (4) that the trial court erred in admitting a first time in-court identification of his girlfriend by an eyewitness, Jacqueline Pecora, (5) that the trial court erred in admitting impermissible hearsay testimony by Pecora that was more prejudicial than probative, (6) that the trial court erred in admitting the defendant's out-of-court statements to the police that were impermissible hearsay, and (7) that the prosecutor committed a *Brady*[2] violation by withholding the exculpatory testimony of an eyewitness, Allen Murchie. We affirm the judgment of the trial court.[3]

The jury was presented with the following evidence upon which to base its verdict. On April 8, 2014, at approximately 6 p.m., Pecora was jogging near the intersection of Hartford Turnpike and Ridge Road in Hamden when she witnessed a white Chrysler 300 drive through the intersection and crash into a "silver blue" Subaru wagon. The driver of the Chrysler, a Caucasian female with blonde hair, who was approximately forty-five to fifty-five years old, pulled over to the shoulder of the road momentarily before leaving the scene. As the Chrysler drove away, Pecora was able to get the number of its license plate. Pecora then ran to get help at a nearby fire station, where she relayed a description of the vehicle that had left the scene and its license plate number to authorities.

Hamden Police Officer Mark Gery subsequently

responded to a dispatch concerning the automobile accident at the intersection of Hartford Turnpike and Ridge Road, where he arrived at approximately 6:10 p.m. Upon his arrival, he observed a single vehicle, a Subaru, which was heavily damaged on its passenger side, stopped in the middle of the intersection. He noted that there appeared to be white paint transfer on the right side of the vehicle. While at the scene, Gery spoke to witnesses who reported to him the license plate number of a second vehicle that had been involved in the accident, but had left the scene. When he traced the license plate number, it came back to a pickup truck registered to the state of Connecticut. Realizing that the license plate number he had been given for the evading vehicle was not correct, he attempted to trace permutations of the reported number in a futile attempt to identify the evading vehicle.

Later that evening, at approximately 9 p.m., the defendant contacted the Wallingford Police Department to report that his vehicle, a white Chrysler 300, had been stolen. He spoke with Officer Coleman Turner, who immediately went to a residence on Wharton Brook Drive in Wallingford to take the defendant's report. There, the defendant told Turner that when he went outside at approximately 9 p.m. to drive to the store to purchase lottery tickets, he found that his vehicle was missing. The officer also spoke with the defendant's girlfriend, Amy McVey, a Caucasian middle-aged female with blonde hair who resided at the Wharton Brook residence outside of which the car was reportedly stolen. The defendant told the officer that McVey was the last person to use his car before it was stolen. She reportedly had driven the vehicle to Walgreens earlier that evening.

The following day, at approximately 1:37 p.m., Officer Abel Gonzalez of the Wallingford Police Department was dispatched to recover a stolen motor vehicle that had been found on Quigley Road in Wallingford, approximately three miles from McVey's residence on Wharton Brook Drive. When he arrived on Quigley Road, Gonzalez discovered the defendant's white Chrysler 300 parked on the roadside with damage to its front end. The officer also noted what appeared to be black paint transfer on the front right corner of the vehicle. Inside the vehicle, which he found to be unlocked, Gonzalez found a wallet containing credit cards and identifying information that matched the name of the registered owner of the vehicle, defendant Jemal Bethea. He found the keys to the vehicle on the back seat. The license plate number of the defendant's vehicle was one digit different from the number Pecora had reported to authorities as the license plate number of the car involved in the evading incident on April 8.

On April 9, 2014, the defendant returned a phone call from Officer Gery. He told the officer that on the

previous night he had been sleeping from 6 p.m. to 9 p.m. before he went outside and discovered that his vehicle was missing. He added that he might have dropped the keys to the vehicle without knowing it while he was bringing packages into his girlfriend's home.

The following day, April 10, 2014, the defendant filed an affidavit of vehicle theft with his insurance company, Omni. In his affidavit, the defendant indicated that the "exact location of the theft" was his residence at 57 Chidsey Drive in North Branford. He then explained the circumstances of the theft, however, as follows: "After coming back from Walgreens [and] picking up meds, at about 6:10 p.m. we went into my girlfriend's house with many bags from [the] store. Put everything away [and] I went upstairs [and] I took a nap. Waking up at about 9 p.m. I decided to go to the store [and] play my numbers. When I went outside I noticed the car was gone. I immediately called 911."

Later that same day, a claims representative from Omni took a recorded statement from the defendant regarding the theft over the telephone. In that statement, the defendant stated that the last time that he had driven his vehicle was at approximately 5:45 p.m. on April 8, when he and his girlfriend had gone to pick up a prescription. He noted that he had a receipt for the prescription and that it was time stamped at 6 p.m. The defendant stated that they came home, unloaded the vehicle, then went into the house, where McVey began to do laundry. The defendant continued: "I went upstairs . . . about an hour and [a] half or even later . . . I got up. I don't know what time, but looked at my phone calls and noticed, you know, what time I was up and everything. And that's when I decided like at 9:30 to go out to the store and play my lottery numbers. And when I went to go look outside, the vehicle was gone . . . ." He reiterated that the car was stolen from in front of his girlfriend's home.

On April 15, 2014, Officer Turner contacted the defendant with follow-up questions regarding the reported theft. The defendant told Turner that on the day his vehicle was stolen, he went to sleep at approximately 6:15 p.m. and woke up at 8:30 p.m. He said that McVey had taken the vehicle to Walgreens shortly before his nap to pick up a prescription and that he had a receipt from that errand, although he did not provide the receipt to Turner. Several days later, the defendant returned to the police station to meet with Turner. During that meeting, the defendant first stated that he alone was responsible for the vehicle and that he was the only one who ever drove it. Then he asked the officer to delete his previous report. The defendant further stated that he was mistaken about the visit to Walgreens, as McVey had used the car to run that particular errand on a different day.

On April 16, 2014, Officer Gery again spoke to the defendant in furtherance of the evading investigation. This time the defendant told the officer that his girlfriend had not been driving his car at the time of the evading incident and neither had he. In fact, he said, his girlfriend was at home taking a phone call on the date and time in question.

On September 11, 2014, the defendant was deposed by an attorney representing Omni. During the deposition, the defendant agreed that his affidavit of vehicle theft had been completed by an insurance agent in his presence and that he had had the opportunity to review the document for its accuracy before signing it. During the deposition, however, he noted that there were inaccuracies in the affidavit. Specifically, he stated that McVey did not go to Walgreens on the day his car was stolen. He explained that he had completed the affidavit three or four days after the incident occurred when his memory was becoming "vague" and, in the time since, he had found the Walgreens receipt, which indicated that McVey had been to the store on April 7, not April 8. When asked if the vehicle had been stolen from his residence in North Branford, as reflected in the affidavit, the defendant replied that the agent had incorrectly completed that portion of the affidavit, for the vehicle was actually taken from McVey's address in Wallingford, as reflected in the narrative portion of the affidavit.

The defendant also noted in the deposition that he had since reviewed his phone records, which showed that he was making phone calls on the day in question from approximately 5:30 p.m. through 9 p.m. He told the attorney for Omni that McVey had been with him that entire time. He was then asked by the attorney whether he recalled telling the police that McVey had parked the vehicle directly in front of her residence on the night in question. He denied that he had ever said that. He was also asked by the attorney whether there were any other individuals whom he allowed to use his vehicle. He first answered that he might allow a friend to use it to go to the store. When the attorney asked him to name specific individuals who had driven the vehicle while he had owned it, he answered that he might let his cousin use it to go to the store. When asked for his cousin's name, he responded: "I'm saying in general. I mean, I mean, I had the car for a year, maybe one or two people ever drove my vehicle." When asked again to clarify if anyone other than the defendant had ever driven the vehicle, he replied: "I mean, like I said, if somebody needed a ride somewhere, a friend or a family member, you know, I mean, nobody used my car. I mean, what are you saying?" The exchange continued with the defendant saying that his cousin had used the car to go to the store once while he was visiting him. When asked for his cousin's name, how-

ever, the defendant responded that he "can't think of his name offhand." When asked to confirm that he did not know his cousin's name, he responded that he had been speaking in general terms. Finally, he declared that the only person who had driven his vehicle was his girlfriend.

Detective Sean Houlihan of the Wallingford Police Department was assigned to investigate the defendant on suspicion that his car had been involved in an evading incident and that he had subsequently committed insurance fraud by making a claim for benefits in connection with that incident. Houlihan applied for a search warrant for cell phone records for a number registered to Bob McVey in Florida that was believed to have been used by the defendant's girlfriend, Amy McVey, in an attempt to discover the movements of that phone on the dates in question. Agent James Wines from the Federal Bureau of Investigation's Cellular Analysis Survey Team analyzed the records obtained by Houlihan. His analysis indicated that on April 8, 2014, between 5:45 p.m. and 6:15 p.m., the McVey cell phone was in the southern Hamden and New Haven areas, not in Wallingford as suggested by the defendant. Further, he opined that at 9:08 a.m. on April 9, the phone had been located just northeast of the location where the defendant's car was recovered later that day.

In closing argument, the prosecutor highlighted the inconsistencies among the defendant's various statements, arguing that they indicated that he was lying about the car theft. He also argued that the eyewitness description of the evading driver and McVey's cell phone records proved that she was the individual involved in the evading incident, and thus that the defendant had falsely reported the car theft to the police and his insurance company in order to ensure that he received money for the vehicle damage that had resulted from that incident. After concluding its deliberations, the jury returned a guilty verdict on the charge of falsely reporting an incident in the second degree and acquitted the defendant of the other two charges. The defendant later was sentenced to a term of one year incarceration, with the execution of that sentence fully suspended, a $750 fine, and two years of probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the evidence was insufficient to support his conviction of falsely reporting an incident in the second degree because the state failed to prove that he knew the information that he reported to police was false at the time he made such report. We disagree.

Section 53a-180c provides in relevant part: "(a) A person is guilty of falsely reporting an incident in the

second degree when, knowing the information reported, conveyed or circulated to be false or baseless, such person gratuitously reports to a law enforcement officer or agency (1) the alleged occurrence of an offense or incident which did not in fact occur . . . ."

"In reviewing a sufficiency of the evidence claim, we apply a two part test. First we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . [An appellate] court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Allan*, 311 Conn. 1, 25, 83 A.3d 326 (2014). In applying that test, "we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Stephen J. R.*, 309 Conn. 586, 594, 72 A.3d 379 (2013). Further, it is well established that "[t]his court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Citation omitted; internal quotation marks omitted.) *State* v. *McClam*, 44 Conn. App. 198, 208, 689 A.2d 475, cert. denied, 240 Conn. 912, 690 A.2d 400 (1997).

On the basis of the evidence it heard, the jury reasonably could have found that the defendant's inconsistent statements surrounding the events of April 8, 2014, were sufficient to establish that he knew that his car had not in fact been stolen at the time he made the theft report to the police. The defendant argues that the inconsistencies in his statements are easily explained and that he merely corrected himself regarding the date on which he went to Walgreens. The determination of whether the changes in his story were mere corrections or inconsistencies demonstrating a consciousness of guilt was well within the province of the jury to make. It was reasonable for the jury to conclude that the defendant's evolving story was strong evidence of its falsehood, especially considering that the reason he gave for the change in his story—that his memory began to fade— is particularly questionable because he gave the police that version of events on the same day the alleged incident occurred. Moreover, the jury reasonably could have found that the evidence of McVey's location gleaned from her cell phone records not only undermined the veracity of the defendant's version of the events of April 8, 2014, but also put McVey at the intersection of Hartford Turnpike and Ridge Road at the

time of the evading incident, thus giving the defendant a motive to fabricate. Pecora's testimony identifying a middle-aged Caucasian woman with blonde hair as the driver of the car involved in the evading incident— a description that matched McVey's appearance—also bolstered this cell tower location evidence. Further, the facts that the defendant's car was discovered near McVey's home and that the cell tower location evidence placed McVey's cell phone in that vicinity on the morning that the car was recovered, could reasonably have been found by the jury to support the state's claim that the defendant and McVey staged the abandonment of the allegedly stolen vehicle to support their false report. For these reasons, the evidence presented, construed in the light most favorable to sustaining the jury's verdict, was sufficient for the jury to find the defendant guilty of falsely reporting an incident. We therefore reject the defendant's first claim.

## II

The defendant next claims that the verdicts returned by the jury were legally inconsistent. Specifically, he argues that the elements of insurance fraud and falsely reporting an incident are overlapping, in that they both require proof that he knowingly made a false statement. He therefore claims that his acquittal on the charge of insurance fraud requires his acquittal on the charge of falsely reporting an incident, as well. We are unpersuaded.

In *State* v. *Arroyo*, 292 Conn. 558, 585, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010), our Supreme Court held that claims of inconsistency between convictions and acquittals are not reviewable on appeal, regardless of whether the alleged inconsistencies are legal, factual, or logical in nature. It reasoned that "an individualized assessment of the reason for the inconsistency would be based either upon pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake. . . . [A] criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts." (Citation omitted; internal quotation marks omitted.) Id. Under this authority, the defendant's claim of inconsistency between his acquittal of attempted larceny and insurance fraud and his conviction of falsely reporting an incident in the second degree is not reviewable.

## III

The defendant's third claim is that the search warrant for McVey's cell phone records and the warrant for the defendant's own arrest in this case were obtained without probable cause because the investigating officers included false information in their affidavits in

support of the issuance of those warrants. As a result, he claims that the challenged search and arrest were unlawful, and, thus, that the fruits of the challenged search should have been suppressed and the conviction, which ultimately resulted from the challenged arrest, should be set aside. For the following reasons, we conclude that both aspects of this claim are unreviewable and devoid of legal merit.

As an initial matter, neither aspect of this claim is preserved, and so the defendant asks that the claim be reviewed under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis omitted; footnote omitted.) *State* v. *Golding*, supra, 239–40.

This unpreserved claim is not reviewable because the record is inadequate. Because the defendant did not challenge the sufficiency of the affidavits to support these warrants at trial, neither affidavit was entered into evidence or otherwise placed on the record. Thus, we have no way to determine what information was included in the challenged affidavits or to evaluate either of the defendant's claims.

Even, however, if we had a record upon which to review these claims, we would conclude that both claims are without merit for the following reasons. First, as to the defendant's challenge to the warrant for the seizure of McVey's cell phone records, the defendant has no standing to assert such a claim. See *Rawlings* v. *Kentucky*, 448 U.S. 98, 105, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980) (holding that defendant had no reasonable expectation of privacy in property of another). Second, as to the defendant's challenge to the allegedly fraudulent basis for the issuance of the warrant for his own arrest, it has long been established that "the fact that [a] person has been illegally arrested or detained [does] not void a subsequent conviction." *State* v. *Haskins*, 188 Conn. 432, 442, 450 A.2d 828 (1982); see also *Frisbie* v. *Collins*, 342 U.S. 519, 522, 72 S. Ct. 509, 96 L. Ed. 541 (1952). For the foregoing reasons, neither aspect of this claim states a valid legal basis upon which relief could be granted in this case even if it were supported by an adequate record.

IV

The defendant next claims that the court improperly permitted Pecora to make an in-court identification of his girlfriend as the driver of the evading vehicle in the absence of a showing that she previously had made a nonsuggestive out-of-court identification of McVey. The defendant, however, did not take exception to Pecora's testimony on this basis, and so he requests review of this claim under *Golding*. We conclude that, although the record is adequate for review, this claim is not reviewable under the second prong of *Golding* because Pecora never made an in-court identification of McVey.

Whether a first time in-court eyewitness identification of the defendant is permissible would typically be a claim of constitutional magnitude because it implicates the defendant's fundamental right of due process. See *State* v. *Dickson*, 322 Conn. 410, 426, 141 A.3d 810 (2016), cert. denied,     U.S.    , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017). In this case, however, Pecora did not make a first time in-court identification of anyone, but merely gave a description of the driver of the other vehicle involved in the evading incident that matched the appearance of the defendant's girlfriend. Because no identification was made, this is not a claim of constitutional magnitude alleging the violation of a fundamental right, and thus is not reviewable under *Golding*.

V

The defendant next claims that the trial court erred in admitting the testimony of Pecora, an eyewitness to the evading incident. Specifically, he claims that Pecora's in-court testimony was inadmissible both because it constituted hearsay and because it was more prejudicial than probative. No objection was made to the challenged testimony at the time of trial, however, so this claim is also unpreserved. The defendant, therefore, requests that we review the claim pursuant to *Golding*. However, unpreserved evidentiary issues are not afforded such review. See *State* v. *Golding*, supra, 213 Conn. 241 ("once identified, unpreserved evidentiary claims masquerading as constitutional claims will be summarily dismissed"). Thus, this unpreserved claim is not reviewable.

VI

The defendant next claims that the court erred in admitting his many out-of-court statements to investigating officers because they are impermissible hearsay evidence. This evidentiary claim is also unpreserved and, therefore, for the reasons stated in part V of this opinion, it is also not reviewable. Even so, there is no question that a defendant's out-of-court statements, when introduced by the state, are admissible as statements by a party opponent under a well established exception to the hearsay rule. See Conn. Code Evid. § 8-3 (1).

VII

Finally, the defendant claims that the prosecutor committed a *Brady* violation by withholding the testimony of Murchie, an alleged eyewitness. See *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Specifically, he claims that the state withheld material evidence of an alleged eyewitness whom the investigating officers failed to pursue and who, allegedly, would have testified that the other vehicle involved in the evading incident was of a different color than his vehicle. We disagree.

The following additional facts are necessary to our review of this claim. On October 26, 2016, this case was listed on a trial management docket when a discussion took place between the defendant, who was then self-represented, the prosecutor, and the court regarding outstanding discovery. The defendant requested that the state turn over an eyewitness statement from an individual named Allen Murchie, whose name appeared in one of the police reports for the case. In response, the prosecutor explained to the court: "[The defendant's] case is an insurance fraud case. There was an accompanying motor vehicle accident, which we chose not to prosecute, that stems from this. There was a witness named Allen Murchie. We've made multiple attempts to contact him. Mr. Bethea has the same information that I have as regards to that witness. . . . There was never a written statement." The defendant stated that the information was material, arguing that Murchie's statement would contain information that negated evidence that his girlfriend was involved in the evading incident while driving his car. The prosecutor responded by representing that she would not be calling Murchie as a witness, that none of the police witnesses would base their testimony on any information received from Murchie, and that he was "not relevant to this case at all." The court, *Klatt, J.*, informed the defendant that the state had the burden of going forward, that the prosecutor was representing that she did not need the eyewitness to prove her case, and, thus, that she was not required to call him as a witness. Therefore, the court ruled, the defendant would have to subpoena the witness himself if he considered the witness necessary for his defense.

Again, this claim is unpreserved and the defendant requests that it be reviewed under *Golding*. In this instance, the record is adequate for review and the issue is of constitutional magnitude, alleging the violation of a fundamental right to due process. See *Gaskin* v. *Commissioner of Correction*, 183 Conn. App. 496, 530, 193 A.3d 625 (2018) ("[t]he *Brady* rule is based on the requirement of due process" [internal quotation marks omitted]). We, therefore, consider whether the alleged constitutional violation exists and deprived the defendant of a fair trial.

The three essential components of a *Brady* claim, all

of which must be established to warrant a new trial, are as follows: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [s]tate, either willfully or inadvertently; and prejudice must have ensued. . . . Under the last *Brady* prong, the prejudice that the defendant suffered as a result of the impropriety must have been material to the case, such that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (Internal quotation marks omitted.) Id., 531–32. "It is well established that [e]vidence known to the defendant or his counsel, or that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady*." (Internal quotation marks omitted.) *State* v. *Williams*, 93 Conn. App. 844, 850, 890 A.2d 630 (2006). "Whether the petitioner was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review." (Internal quotation marks omitted.) *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 284, 979 A.2d 507, cert. denied, 294 Conn 906, 982 A.2d 1080 (2009).

The evidence at issue was potentially favorable, as argued by the defendant, to impeach the testimony of Pecora regarding the evading incident. However, even if we assume arguendo that the evidence was favorable to the defendant, there is no evidence that the prosecutor suppressed such evidence. The defendant had equal access to the witness, as noted by the state and as evidenced by the fact that the defendant appears from his brief to have obtained a statement from that witness independently, albeit after the time of his trial. Because the evidence was not suppressed, we cannot conclude that the prosecutor committed a *Brady* violation.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant was also charged with, but was acquitted of, attempt to commit larceny in the second degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-123 (a) (2), and insurance fraud in violation of General Statutes § 53a-215 (a) (1).

[2] In *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

[3] With the exception of the defendant's claim that insufficient evidence was presented to sustain his conviction for falsely reporting an incident, the state argues that he has failed to adequately brief each of these claims and, thus, has abandoned them. We recognize that the defendant's brief lacks precision and fails to provide a thorough analysis of the relevant legal authorities, however, "it is our policy to give leeway to [self-represented] litigants regarding their adherence to the rules of this court." *In re Brittany J.*, 100 Conn. App. 329, 330, 917 A.2d 1024 (2007). "The modern trend . . . is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . The courts adhere to this rule to ensure that [self-represented] litigants receive a full and fair opportunity to be heard, regardless of their lack of legal education and experience." (Internal quotation marks omitted.) *Mourning* v. *Commissioner of Correction*, 120 Conn. App. 612, 624–25, 992 A.2d 1169, cert. denied, 297 Conn. 919, 996 A.2d 1192 (2010).

However, "while courts should not construe pleadings narrowly and techni-cally, courts also cannot contort pleadings in such a way so as to strain the bounds of rational comprehension." (Internal quotation marks omitted.) Id., 625. To the extent the defendant raises additional claims, they are inadequately briefed and we decline to "strain the bounds of rational compre-hension" to reach them. Id.

––––––––––––––––––––––––