******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* CARLTON BRYAN
## (AC 40848)

Keller, Prescott and Moll, Js.

*Syllabus*

Convicted of the crimes of murder and conspiracy to commit murder in connection with the shooting death of the victim, who was pregnant with his child, the defendant appealed. The defendant had plotted with a friend, H, to kill the victim after she refused the defendant's requests to have an abortion. The victim and the defendant had driven to a location where the defendant purportedly intended to collect money from someone. H, who had driven the defendant's car to the area and parked nearby, thereafter approached the victim's parked car, in which she and the defendant were sitting, and fatally shot the victim. The defendant later told a police detective, E, that an unknown individual had attempted to rob them and shot the victim as she tried to drive away. H thereafter told a friend, M, that he had killed the victim at the defendant's behest, after which H and M robbed a store using the gun that H had used to shoot the victim, which they then hid in a park. The defendant subsequently told E that H and M had robbed the store, after which M turned himself in to the police and helped them retrieve the gun. At trial, after H invoked his privilege against self-incrimination and declined to testify, M testified about the gun and what H had told him concerning the victim's murder. On appeal, the defendant claimed, inter alia, that the trial court improperly admitted into evidence H's statements to M as dual inculpatory statements pursuant to the applicable provision (§ 8-6 [4]) of the Connecticut Code of Evidence. *Held*:

1. The trial court did not abuse its discretion by admitting H's statements to M about the victim's murder as dual inculpatory statements under § 8-6 (4), as H's statements were sufficiently trustworthy and against his penal interest:

    a. The defendant's claim that H's statements to M were inadmissible as dual inculpatory statements because they sought to shift the blame for the victim's murder to the defendant was unavailing, as the statements were squarely against H's penal interest; H had unequivocally admitted to killing the victim as part of a scheme he and the defendant concocted, the statements implicated H and the defendant equally, and even if H's statements suggested that he was trying to minimize his involvement in the scheme or to explain his reasons for killing the victim, they exposed him to potential liability for the same crimes with which the defendant was charged, for which H was convicted in a separate trial.

    b. The trial court correctly concluded that H's statements to M were sufficiently trustworthy, as H, who sometimes stayed at M's home, made the statements less than two weeks after the victim's murder, and H and M, who robbed the store together, trusted one another, shared a friendship and had known each other for about ten years at the time H made the statements; moreover, the truthfulness of H's statements was corroborated by evidence that included an attempt by H and M to repair the gun before the victim's murder, and testimony from W that, less than two hours before the murder, the defendant, who was accompanied by H, told W that he wanted to kill the victim and asked W to act as a lookout and to provide a false statement to the police.

2. The defendant could not prevail on his unpreserved claim that the state failed to disclose to him certain police internal affairs records, in violation of *Brady* v. *Maryland* (373 U.S. 83), that concerned allegations of prior misconduct by E, as those records were not material to the outcome of the defendant's trial; moreover, even if the records could have been used to impeach E's credibility, there was overwhelming evidence to support the defendant's conviction, the impeachment of E with the records would not have raised doubts about the reliability of the testimony of W and M, as M's testimony directly implicated the defendant in the victim's murder, and the impeachment of E with the records in order to call into question W's credibility would have been cumulative, as the defendant argued to the jury, concerning the circumstances sur-

rounding a written statement that W had given to the police, that the evidence suggested that W had been coerced by the police, and there was no indication that W's testimony was tainted as a result of his interactions with the police.

Argued April 16—officially released October 1, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of murder and conspiracy to commit murder, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Bentivegna, J.*; verdict and judgment of guilty, from which the defendant appealed; thereafter, the court, *Bentivegna, J.*, denied in part the defendant's motions for augmentation and rectification of the record. *Affirmed.*

*Erica A. Barber*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Robert J. Scheinblum* and *Donna Mambrino*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

MOLL, J. The defendant, Carlton Bryan, appeals from the judgment of conviction,[1] rendered after a jury trial, of murder in violation of General Statutes §§ 53a-54a (a)[2] and 53a-8,[3] and conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a)[4] and 53a-54a (a). On appeal, the defendant claims that (1) the trial court erroneously concluded that an unavailable declarant's hearsay statements were admissible as dual inculpatory statements pursuant to § 8-6 (4) of the Connecticut Code of Evidence, and (2) the state, in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), failed to disclose to him certain internal affairs records relating to Reginald Early, a police sergeant whom the state called as a witness at trial. We affirm the judgment of the trial court.

On the basis of the evidence adduced at trial, the jury reasonably could have found the following facts. In April, 2013, the victim, Shamari Jenkins, was four months pregnant with the defendant's child. At that time, the defendant had a minor child with another woman, Iesha Wimbush, with whom the defendant had an "off and on" relationship. On several occasions after learning of the victim's pregnancy, the defendant encouraged the victim to have an abortion. After initially informing the defendant that she would have an abortion, the victim told the defendant that she ultimately had decided not to proceed with an abortion. The victim's decision angered and upset the defendant because the victim's pregnancy was a source of contention between the defendant and Wimbush.

Having failed to convince the victim to have an abortion, the defendant plotted with Matthew Allen Hall-Davis, a close friend of his, to kill the victim and terminate the pregnancy. Sometime in March, 2013, the defendant asked Reginald Lewis, a former coworker of his, to clean and repair a firearm, a .44 magnum Ruger Super Black Hawk revolver (.44 Ruger). Lewis was unable to fix the .44 Ruger and returned it, along with certain gun components that the defendant had ordered for the repair, to the defendant. Hall-Davis, who was present when Lewis returned the .44 Ruger to the defendant, told Lewis that he would fix the .44 Ruger. At some time prior to the morning of April 29, 2013, the defendant and Hall-Davis repaired the .44 Ruger.

On April 28, 2013, the defendant, the victim, and Hall-Davis attended a cookout at the home of the victim's father in East Hartford. The defendant and Hall-Davis left the cookout together at about dusk. At approximately 11 p.m. that night, the defendant and Hall-Davis met with Everett Walker, a cousin of Hall-Davis', near Walker's apartment building located on Magnolia Street in Hartford. The defendant told Walker that he was having "problems" with the victim stemming from the

victim's refusal to have an abortion and that he wanted to kill the victim in the vicinity of Walker's apartment building. The defendant asked Walker to provide assistance by acting as a lookout and by telling the police officers who would be dispatched to the crime scene that he had observed an unknown individual running away from the scene. Walker did not respond to the defendant's request and returned to his apartment alone.

Sometime between 12 and 12:30 a.m. on April 29, 2013, the victim left her father's cookout and met with the defendant, whom she then drove in her car to Magnolia Street, where the defendant purportedly intended to meet with and collect money from a cousin of his. The victim parked her car along the curb of the street, and the defendant exited the car. At about that time, Hall-Davis had driven and parked the defendant's car on an adjacent street. After the defendant had returned to and reentered the victim's car, the victim began driving away from the curb. At that moment, Hall-Davis approached the car and, using the .44 Ruger, fired a single gunshot through the rear windshield of the car, striking the victim. The car then accelerated and crashed into the front stairs of a nearby home. The defendant proceeded to call 911 to report that the victim had been shot, without identifying the shooter.

At approximately 1 a.m. on April 29, 2013, Officer Jay Szepanski of the Hartford Police Department was dispatched to the area of Magnolia Street and Mather Street in Hartford to investigate a reported shooting. When he arrived at the scene, Szepanski found the defendant in the street yelling and waving him down. Szepanski found the victim slumped between the front seats of her car and unresponsive. The defendant told Szepanski that the victim had given him a ride to meet with his cousin and that, after he had returned to the car, an unidentified individual fired a gunshot through the rear windshield of the car that struck the victim.[5] Shortly thereafter, medical personnel arrived and transported the victim to Saint Francis Hospital and Medical Center (hospital) in Hartford, where she was pronounced dead as a result of a gunshot wound to the chest.

Later in the morning on April 29, 2013, Szepanski transported the defendant to the Hartford Police Department and thereafter to the hospital. Early, who was at the time a detective in the Hartford Police Department's major crimes division but later was promoted to sergeant, briefly spoke with the defendant at the police station and later at the hospital. With respect to the victim's murder, the defendant told Early that an unknown individual had attempted to rob the defendant and the victim while they were sitting in the victim's car, the victim tried to drive away to escape the attempted robbery, and, as the victim was driving away, the indi-

vidual fired into the car a gunshot that struck the victim. The defendant did not provide a written statement at that time.

Later that same day, after Early had spoken with the defendant at the hospital, the defendant met with Hall-Davis and drove him to the Hartford Police Department. There, Hall-Davis had a conversation with Early about the victim's murder; however, he declined to provide a written statement at that time.[6] Following Hall-Davis' conversation with Early, the defendant picked up Hall-Davis from the police station.

On May 1, 2013, the defendant met with Early at the Hartford Police Department and submitted a signed, sworn statement regarding the victim's murder. In that statement, the defendant averred that an individual nicknamed "Low," whose real name was Kevan Simmons, attempted to rob the defendant and the victim while they were sitting in the victim's car, and that Simmons shot the victim as she tried to drive away. The defendant further averred that he did not immediately identify Simmons as the shooter to the police because the defendant wanted to get revenge on Simmons himself, but, after giving it more thought, the defendant decided to inform the police that Simmons had shot the victim. Following an ensuing investigation, Early ruled out Simmons as a suspect in the victim's murder.

On the day of the victim's funeral, which was held sometime before May 11, 2013, Hall-Davis met with Kingsley Minto, a mutual friend of his and the defendant's, at Minto's home in Vernon. Hall-Davis confessed to Minto that he had killed the victim at the defendant's behest in order to terminate the victim's pregnancy. Hall-Davis told Minto that he initially was reluctant to comply with the defendant's request to kill the victim; however, after the defendant repeatedly had pleaded with him, Hall-Davis agreed to commit the crime because he felt obligated to assist the defendant on account that, during the course of their friendship, the defendant had provided him with financial support, written letters to him while he had been incarcerated, and permitted him to stay at the defendant's home. Hall-Davis then asked Minto for money so that he could flee the area. Minto replied that he had no money to give to Hall-Davis.

On May 11, 2013, Minto and Hall-Davis robbed a jewelry store in Manchester (Manchester robbery). Hall-Davis brandished the .44 Ruger in the course of the Manchester robbery, which was recorded on surveillance video. As Hall-Davis and Minto were driving away from the jewelry store, Hall-Davis tossed out of the car window a shell casing, which Hall-Davis told Minto was from the bullet that he had fired at the victim. Later that day, Hall-Davis and Minto drove to a park in Vernon, where Hall-Davis hid the .44 Ruger under some leaves and brush.

At some point after the Manchester robbery, the defendant and Hall-Davis met with one another in Hartford. The defendant asked Hall-Davis where the .44 Ruger was, and Hall-Davis replied that he had gotten rid of it. The defendant, using his cell phone, then showed Hall-Davis video footage of the Manchester robbery that he had found on the Internet, which depicted Hall-Davis holding the .44 Ruger during the Manchester robbery. Evidently having had the belief that Hall-Davis had disposed of the .44 Ruger immediately after the victim's murder, the defendant became upset that Hall-Davis had lied to him about the disposal of the .44 Ruger, after which Hall-Davis left.

In the middle of May, 2013, the defendant traveled to Florida to stay with his father. While he was in Florida, the defendant called Early on numerous occasions to convey that Hall-Davis and Minto had committed the Manchester robbery. Early shared that information with the Manchester Police Department, and, largely on the basis of that information, the Manchester Police Department secured arrest warrants for Hall-Davis and Minto in connection with the Manchester robbery. Hall-Davis was arrested on May 23, 2013, and Minto turned himself in to the police on May 25, 2013. While in police custody, Minto admitted to his involvement in the Manchester robbery and assisted the police in locating and retrieving the .44 Ruger that Hall-Davis had hidden in the park in Vernon.

After turning himself in to the police, Minto also submitted a signed, sworn statement regarding the victim's murder. On the basis of information that he obtained during the course of his investigation from, inter alia, Minto, Hall-Davis, and Lewis, Early secured arrest warrants for Hall-Davis and the defendant in relation to the victim's murder. On June 6, 2013, Early arrested the defendant, who had returned from Florida, at Wimbush's home in Windsor.[7] After waiving his *Miranda* rights,[8] the defendant agreed to be interviewed by Early, along with another detective, and submitted a signed, sworn statement. In that statement, the defendant averred that, while he was sitting with the victim in her car on Magnolia Street on April 29, 2013, Hall-Davis entered the car and sat in the backseat behind the victim. Early questioned the defendant as to how Hall-Davis could have entered the car, which had two doors only, without the defendant first exiting the car, and Early noted that the bullet that struck the victim had been shot through the rear windshield of the car and would have hit Hall-Davis had he been seated in the backseat of the car. The defendant terminated the interview at that juncture.

By way of a long form information dated May 1, 2015, the defendant was charged with murder in violation of §§ 53a-54a (a) and 53a-8, and conspiracy to commit murder in violation of §§ 53a-48 (a) and 53a-54a (a). On

May 28, 2015, following a jury trial, the jury found the defendant guilty on both counts, and the trial court, *Bentivegna, J.*, accepted the jury's verdict. On July 30, 2015, the court sentenced the defendant to sixty years of incarceration on the charge of murder and twenty years of incarceration on the charge of conspiracy to commit murder, with the sentences to run consecutively, for a total effective sentence of eighty years of incarceration.[9] This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the court erroneously concluded that certain hearsay statements made by Hall-Davis to Minto concerning the victim's murder were admissible as dual inculpatory statements pursuant to § 8-6 (4) of the Connecticut Code of Evidence. Specifically, the defendant asserts that (1) portions of Hall-Davis' statements were not against Hall-Davis' penal interest but, instead, shifted the blame for the victim's murder to the defendant, and (2) Hall-Davis' statements were not sufficiently trustworthy. We conclude that the court did not abuse its discretion by admitting the statements.

The following additional facts and procedural history are relevant to our disposition of the defendant's claim. During its case-in-chief on the second day of evidence, the state called Hall-Davis as a witness. As the clerk attempted to swear him in, Hall-Davis invoked his fifth amendment privilege against self-incrimination and declined to testify. The court excused Hall-Davis after determining that he had properly invoked his fifth amendment privilege against self-incrimination.

On the third day of evidence, the state called Minto as a witness. Before Minto was sworn in, the court noted that there was an evidentiary issue to resolve relating to Minto's testimony and asked the state to make an offer of proof. Outside of the jury's presence, the state proffered that, pursuant to the statement against penal interest exception to the hearsay rule codified in § 8-6 (4) of the Connecticut Code of Evidence, Minto would testify, inter alia, as follows: Hall-Davis told Minto on the day of the victim's funeral that Hall-Davis killed the victim after the defendant had "kept pressuring" Hall-Davis to do so and that Hall-Davis felt that "he needed" to comply with the defendant's request because of their close friendship; Hall-Davis confessed to Minto that he had shot the victim because he trusted Minto not to share that information with anyone; Hall-Davis and Minto had known each other for approximately ten years at the time of the victim's murder; Minto was familiar with Hall-Davis' life and upbringing; Hall-Davis' mother and Minto's wife were friends; Hall-Davis at times had lived with Minto; and Hall-Davis and Minto committed the Manchester robbery together. The defendant objected to the prof-

fered testimony, arguing that Hall-Davis' statements to Minto were self-serving, Minto and Hall-Davis did not have a close relationship, and Hall-Davis' statements were not recorded.

Following argument, the court overruled the defendant's objection and determined that Hall-Davis' hearsay statements to Minto were admissible as dual inculpatory statements pursuant to § 8-6 (4) of the Connecticut Code of Evidence. In reaching its decision, the court determined: (1) Hall-Davis was unavailable to testify because he had invoked his fifth amendment privilege against self-incrimination; (2) Hall-Davis' statements were against his penal interest; and (3) the statements were sufficiently trustworthy.

Following the court's ruling, the state elicited testimony from Minto. Minto testified that, on the day of the victim's funeral, Hall-Davis met with Minto at Minto's home in Vernon. Minto then testified in relevant part as follows:

"Q. And what did [Hall-Davis] tell you?

"A. He asked me: Who [do] you think kill[ed] [the victim]?

"Q. And what was your response?

"A. I said I think [the defendant] did it.

"Q. And what did [Hall-Davis] tell you?

"A. He said, no, I did it.

"Q. And what was your reaction when [Hall-Davis] told [you] that he did it?

"A. I was shocked and I was upset and I was crying.

"Q. And did you say something specifically to him when he told you that?

"A. Yes. I said he was stupid, like, why would you even kill [the victim] if you didn't get her pregnant?

"Q. And what was [Hall-Davis'] response to you when you asked him that question?

"A. He said he did it for [the defendant].

"Q. And when he said he did it for [the defendant], did he tell you that he did this—that he wanted to do it?

"A. Yes.

"Q. And did [Hall-Davis] tell you that anything that [the defendant] did or said to him to get him to kill [the victim]?

"A. At first he didn't want to do it. And then—

"Q. When you say 'he,' do you mean [Hall-Davis]?

"A. Yes, [Hall-Davis]. He didn't want to do it.

"Q. At first he didn't want to do it.

"A. Yes.

"Q. But?

"A. [The defendant] kept pleading into him to do it for [the defendant].

"Q. So, [the defendant] kept pleading [with Hall-Davis] to do it for [the defendant]?

"A. Yes.

"Q. And when [the defendant] kept pleading with [Hall-Davis] to do it, did he give you—did [Hall-Davis] give you an explanation why he would do such a thing for [the defendant]?

"A. Yes.

"Q. What did he tell you?

"A. [The defendant] looked out for him while he was in jail, gave him money, wrote him letters, gave him a place to stay while he was incarcerated.

"Q. Did he tell you he felt obliged to help out [the defendant]?

"A. Yes. . . .

"Q. And how does that make sense to you based on what you know about [Hall-Davis]?

"A. They [were] friends. He was just looking out for a friend.

"Q. Did [Hall-Davis] tell you anything about why this defendant wanted [the victim] dead?

"A. Yes.

"Q. What did he tell you?

"A. That it was causing problems with [the defendant] and [Wimbush].

"Q. Did he tell you anything about the pregnancy?

"A. Yeah. That [the defendant] wanted to get rid of the baby, get rid of [the victim] before she hit seven months.

\* \* \*

"Q. Now, after [the victim's] funeral, did this defendant—excuse me, did [Hall-Davis] tell you why he was telling you about [the victim's] murder?

"A. Yes. . . .

"Q. What did he tell you?

"A. He trusted me not to turn on him."

We begin by setting forth the relevant standard of review and legal principles governing our disposition of the defendant's claim. "To the extent a trial court's admission of evidence is based on an interpretation of the [Connecticut] Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are

legal questions demanding plenary review. They require determinations about which reasonable minds may not differ; there is no judgment call by the trial court . . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Vega*, 181 Conn. App. 456, 463–64, 187 A.3d 424, cert. denied, 330 Conn. 928, 194 A.3d 777 (2018).

"An [out-of-court] statement is hearsay when it is offered to establish the truth of the matters contained therein." (Internal quotation marks omitted.) *State* v. *Rivera*, 181 Conn. App. 215, 223, 186 A.3d 70, cert. denied, 329 Conn. 907, 184 A.3d 1216 (2018). "As a general matter, hearsay statements may not be admitted into evidence unless they fall within a recognized exception to the hearsay rule. . . . Section 8-6 of the Connecticut Code of Evidence provides in relevant part that [t]he following are not excluded by the hearsay rule if the declarant is unavailable as a witness . . . (4) Statement against penal interest. A trustworthy statement against penal interest that, at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest. . . . In short, the admissibility of a hearsay statement pursuant to § 8-6 (4) of the Connecticut Code of Evidence is subject to a binary inquiry: (1) whether [the] statement . . . was against [the declarant's] penal interest and, if so, (2) whether the statement was sufficiently trustworthy." (Citation omitted; internal quotation marks omitted.) *State* v. *Bonds*, 172 Conn. App. 108, 117, 158 A.3d 826, cert. denied, 326 Conn. 907, 163 A.3d 1206 (2017).

In the present case, the court admitted Hall-Davis' hearsay statements to Minto as dual inculpatory statements. "A dual inculpatory statement is a statement that inculpates both the declarant and a third party, in this case the defendant. . . . We evaluate dual inculpatory statements using the same criteria we use for statements against penal interest." (Internal quotation marks omitted.) *State* v. *Azevedo*, 178 Conn. App. 671, 686, 176 A.3d 1196 (2017), cert. denied, 328 Conn. 908, 178 A.3d 390 (2018).

A

We first address the defendant's assertion that portions of Hall-Davis' statements to Minto were not against his penal interest. Specifically, the defendant contends that blame-shifting statements made by a

declarant in a broader self-inculpatory narrative are not admissible as dual inculpatory statements, such that "at least those portions of [Hall-Davis'] alleged statements shifting blame from [Hall-Davis] to the defendant should have been excluded from evidence, including [Hall-Davis'] statements identifying the defendant as the architect of the crime and supplying his so-called motive for the murder." The state responds that Hall-Davis' statements in their entirety were self-inculpatory and against Hall-Davis' penal interest.[10] We agree with the state.

"Section 8-6 (4) preserves the common-law definition of 'against penal interest' in providing that the statement be one that 'so far tend[s] to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true.' " Connecticut Code of Evidence § 8-6 (4), commentary. "Whether a statement is against a declarant's penal interests is an objective inquiry of law, rather than a subjective analysis of the declarant's personal legal knowledge. Under § 8-6 (4) [of the Connecticut Code of Evidence], we must evaluate the statements according to a reasonable person standard, not according to an inquiry into the declarant's personal knowledge or state of mind." (Internal quotation marks omitted.) *State* v. *Azevedo*, supra, 178 Conn. App. 686.

In his statements to Minto, Hall-Davis confessed that he had killed the victim after the defendant repeatedly had pleaded with him to commit the crime in order to terminate the victim's pregnancy. Hall-Davis also told Minto that he killed the victim out of a sense of obligation to the defendant, who had supported him in a variety of ways throughout their friendship.[11] Contrary to the defendant's contention, none of Hall-Davis' statements to Minto can be construed as blame-shifting. Hall-Davis unequivocally admitted to killing the victim as part of a scheme concocted between himself and the defendant. Even if Hall-Davis' statements suggest that he was trying to minimize his involvement in the scheme or to explain his reasons for killing the victim, the statements exposed him to potential liability for the same crimes with which the defendant was charged, and, thus, the statements implicated Hall-Davis and the defendant equally. See *State* v. *Camacho*, 282 Conn. 328, 360, 924 A.2d 99 (declarant's statements were not blame-shifting because they "exposed [the declarant] to potential liability for the same crimes with which the defendant is now charged, thereby implicating both himself and the defendant equally" [footnote omitted]), cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007); *State* v. *Rivera*, 268 Conn. 351, 368, 844 A.2d 191 (2004) (declarant's statement was squarely against penal interest because, even if statement was attempt to minimize his involvement in homicide, it nonetheless "fully and equally implicated both [the declarant] and

the defendant"); *State* v. *Azevedo*, supra, 178 Conn. App. 688 (declarant's statements were not blame-shifting because they "exposed him to liability for the same crimes for which the defendant was charged"). In fact, Hall-Davis was tried and convicted of murder and conspiracy to commit murder, the same charges on which the defendant was tried and convicted, along with criminal possession of a firearm, in a separate trial.[12] See footnote 9 of this opinion. Accordingly, Hall-Davis' statements to Minto were squarely against his penal interest and within the ambit of § 8-6 (4) of the Connecticut Code of Evidence as dual inculpatory statements.[13]

B

Having determined that Hall-Davis' statements to Minto in their entirety were against Hall-Davis' penal interest, we next turn to the defendant's contention that the statements were not sufficiently trustworthy. The state responds that the court properly determined that the statements bore adequate indicia of reliability. We agree with the state.

"In determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest. . . . Conn. Code Evid. § 8-6 (4). Additionally, when evaluating a statement against penal interest, the trial court must carefully weigh all of the relevant factors in determining whether the statement bears sufficient indicia of reliability to warrant its admission. . . . As we previously have stated, when viewing this issue through an evidentiary lens, we examine whether the trial court properly exercised its discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 68, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006). "[N]o single factor for determining trustworthiness . . . is necessarily conclusive. . . . Rather, the trial court is tasked with weighing all of the relevant factors set forth in § 8-6 (4) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Bonds*, supra, 172 Conn. App. 125.

In the present case, after determining that Hall-Davis was unavailable to testify[14] and that his statements to Minto were against his penal interest, the court, on the basis of the state's offer of proof, determined that the statements were adequately trustworthy, stating: "And in determining the trustworthiness and factoring those requirements, in this case Hall-Davis' statements were made to Minto, who—and they were close personal friends. They had a personal relationship. They'd known each other for a long time. The statements were made shortly after the crime was committed. And then the statements were corroborated. Corroborating details

connecting the statements to the crime have been testified to already, and it's corroborated by numerous circumstances and coincidence."

Mindful of the factors set forth in § 8-6 (4) of the Connecticut Code of Evidence, we conclude that the court did not err in determining that Hall-Davis' statements to Minto were sufficiently trustworthy. First, the timing of Hall-Davis' statements to Minto strengthens their reliability. "In general, declarations made soon after the crime suggest more reliability than those made after a lapse of time where a declarant has a more ample opportunity for reflection and contrivance." (Internal quotation marks omitted.) *State* v. *Camacho*, supra, 282 Conn. 361. Here, Hall-Davis made the statements to Minto on the day of the victim's funeral, which was held less than two weeks following the victim's murder. See *State* v. *Smith*, 289 Conn. 598, 631, 960 A.2d 993 (2008) (statements made less than three months following murder deemed trustworthy); *State* v. *Camacho*, supra, 361 (statements made approximately one week following murders deemed trustworthy); *State* v. *Pierre*, supra, 277 Conn. 71 (statements made within "couple of weeks" following homicide deemed trustworthy); *State* v. *Rivera*, supra, 268 Conn. 370 (statements made within five months following homicide deemed trustworthy).

Relatedly, the relationship between Minto and Hall-Davis strengthens the trustworthiness of Hall-Davis' statements. Minto had known Hall-Davis for approximately ten years at the time of the victim's murder and knew details about Hall-Davis' upbringing. In addition, Minto's wife was friends with Hall-Davis' mother, and Hall-Davis sometimes stayed at Minto's home. Minto and Hall-Davis also committed the Manchester robbery together. Although Minto and Hall-Davis are not related, they trusted one another and shared a friendship. See *State* v. *Pierre*, supra, 277 Conn. 70 ("[A]lthough [the witness] was not a relative of [the declarant] . . . a factor that [our Supreme Court has] previously noted when evaluating whether a statement is trustworthy, the trial court specifically found that [the witness] was far from a stranger either. . . . [T]he fact remains that they shared a friendship and a relationship of trust."); see also *State* v. *Camacho*, supra, 282 Conn. 362 (citing *Pierre* for same proposition).[15]

Second, there was evidence in the record corroborating the truthfulness of Hall-Davis' statements. For example, Lewis testified that, before the victim's murder, the defendant and Hall-Davis approached him about fixing the .44 Ruger, and that Hall-Davis told Lewis that he would repair it. The victim's father testified that, on the day before the victim's murder, the defendant and Hall-Davis attended a cookout at his home and left together at about dusk. In addition, Walker testified that, less than two hours before the

victim's murder, the defendant, with Hall-Davis accompanying him, told Walker that he wanted to kill the victim and asked Walker to act as a lookout and to provide a false statement to the police officers who would be dispatched to the crime scene.

Finally, § 8-6 (4) of the Connecticut Code of Evidence also requires the trial court to consider the extent to which a declarant's statement was against his or her penal interest. As the court determined, and as we concluded in part I A of this opinion, Hall-Davis' statements in their entirety were squarely against his penal interest.

In sum, we conclude that Hall-Davis' hearsay statements to Minto in their entirety were against his penal interest and sufficiently trustworthy. Accordingly, the court did not abuse its discretion by admitting the statements as dual inculpatory statements under § 8-6 (4) of the Connecticut Code of Evidence.[16]

## II

We next address the defendant's claims that the state violated *Brady* by failing to disclose to him certain internal affairs records detailing investigations conducted by the Hartford Police Department into allegations of misconduct committed by Early. For the reasons we set forth subsequently in this opinion, these claims fail.

The following additional facts and procedural history are relevant to our resolution of these claims. On February 25, 2015, the defendant filed a pretrial motion for "*Giglio* material,"[17] requesting that the state disclose materials relevant to the impeachment of the state's witnesses and informants, including files relating to the witnesses and informants, confidential or otherwise, and evidence of perjury or false statements committed or made by the witnesses and informants. On March 6, 2015, the court, *Alexander*, *J.*, granted the motion. On May 18, 2015, prior to the start of the evidentiary portion of trial, defense counsel confirmed with the court, *Bentivegna*, *J.*, that the state had complied with the defendant's request for *Giglio* material.

During its case-in-chief, the state called Early as a witness on two separate occasions. Early testified in relevant part as follows: he was the lead detective investigating the victim's murder; on April 29, 2013, shortly after the victim's murder, the defendant spoke with him and told him that an unknown individual had shot the victim; on April 29, 2013, after speaking with the defendant, he spoke with Hall-Davis about the victim's murder; on May 1, 2013, he received from the defendant a signed, sworn statement regarding the victim's murder, which was admitted into evidence as a full exhibit, in which the defendant averred that Simmons had shot the victim after a failed robbery attempt; after the defendant had traveled to Florida in the middle of May, 2013, the defendant called him numerous times to convey that

Hall-Davis and Minto had committed the Manchester robbery; following their arrests in connection with the Manchester robbery, he received information from Minto and Hall-Davis regarding the victim's murder;[18] on the basis of the information that he received from Hall-Davis, he spoke with Lewis, who provided him with invoices for the repair parts that were ordered to fix the .44 Ruger, which were admitted into evidence as full exhibits, and who submitted a signed, sworn statement; on the basis of his investigation, he secured arrest warrants for Hall-Davis and the defendant with respect to the victim's murder; on June 6, 2013, he located and arrested the defendant inside Wimbush's home in Windsor; and following the defendant's arrest, he received from the defendant a signed, sworn statement regarding the victim's murder, which was admitted into evidence as a full exhibit, in which the defendant averred that Hall-Davis had been in the car with him and the victim shortly before the victim's murder.

On August 19, 2016, while this appeal was pending before our Supreme Court; see footnote 1 of this opinion; the defendant filed a motion for augmentation and rectification of the record (2016 motion for augmentation and rectification).[19] Defense counsel alleged therein that, in the course of her law office's representation of another individual in an unrelated federal case, the United States Attorney's Office for the District of Connecticut had provided counsel's office with an internal affairs report, dated 2008, detailing an investigation conducted by the Hartford Police Department into an incident involving Early in 2007. Defense counsel asserted that Early was one of the state's key witnesses against the defendant and that the state's nondisclosure of the report, which purportedly contained evidence impeaching Early's credibility, violated *Brady*. Defense counsel requested, as relief, that the trial court conduct an evidentiary hearing pursuant to *State* v. *Floyd*, 253 Conn. 700, 756 A.2d 799 (2000) (*Floyd* hearing),[20] to make the report a part of the record and to "establish the circumstances of the [state's] nondisclosure prior to and during trial." On August 29, 2016, the state filed a partial opposition to the motion. The state did not object to having the report become a part of the record, but the state opposed the request for a *Floyd* hearing, arguing that (1) the state would stipulate that the report was not disclosed at the time of trial, (2) the report was not favorable to the defendant because it did not contain information pertaining to Early's veracity, and (3) even if the report was favorable to the defendant, it was not material under *Brady*.

On February 23, 2017, the court held a hearing on the 2016 motion for augmentation and rectification. During the hearing, the court admitted into evidence internal affairs records, dated 2008, relating to the incident involving Early in 2007 (2008 internal affairs records).[21] On March 15, 2017, the court issued a memo-

randum of decision granting in part and denying in part the 2016 motion for augmentation and rectification. The court granted the motion in terms of making the 2008 internal affairs records a part of the record for purposes of appellate review, but the court denied the defendant's request for a *Floyd* hearing, concluding that, although the state had conceded that it had not disclosed the 2008 internal affairs records to the defendant prior to trial, the defendant had failed to produce sufficient prima facie evidence of a *Brady* violation unascertainable at trial. On March 31, 2017, pursuant to Practice Book § 66-7, the defendant filed a motion for review of the ruling on the 2016 motion for augmentation and rectification.[22]

On May 3, 2017, our Supreme Court denied the motion for review "without prejudice to the parties addressing in the appellate briefs whether the trial court properly found that the defendant did not meet his burden of proving a violation of [*Brady*]."

On June 22, 2018, after this appeal had been transferred to this court; see footnote 1 of this opinion; and after the parties had filed their principal appellate briefs, the defendant filed a motion for further augmentation and rectification of the record (2018 motion for augmentation and rectification).[23] Defense counsel alleged therein that counsel recently had discovered that the state failed to disclose additional internal affairs records, dated 2005, detailing an investigation conducted by the Hartford Police Department with respect to an incident involving Early in 2005 (2005 internal affairs records). Defense counsel asserted that the state's nondisclosure of the 2005 internal affairs records, which purportedly contained evidence impeaching Early's credibility, violated *Brady* and, as relief, requested that the trial court conduct a *Floyd* hearing to make the 2005 internal affairs records a part of the record and to establish the "circumstances of the [state's] nondisclosure prior to and during trial." On June 25, 2018, the state filed a partial opposition to the motion. The state did not object to the court making the 2005 internal affairs records a part of the record, but the state opposed the request for a *Floyd* hearing, arguing that (1) the state would stipulate that the 2005 internal affairs records were not disclosed at the time of trial, (2) the 2005 internal affairs records were not favorable to the defendant because they did not contain information pertaining to Early's veracity, and (3) even if the 2005 internal affairs records were favorable to the defendant, they were not material under *Brady*.

On August 31, 2018, the trial court held a hearing on the 2018 motion for augmentation and rectification. During the hearing, the court admitted into evidence the 2005 internal affairs records and made a finding, in accordance with a stipulation agreed to by the parties, that the 2005 internal affairs records had not been dis-

closed to the defendant at the time of trial. There was no additional argument on the motion. On October 22, 2018, the court issued a memorandum of decision, stating that the 2018 motion for augmentation and rectification was "granted in terms of making the [2005 internal affairs records] a part of the record for the purpose of appellate review." The court did not expressly adjudicate the defendant's request for a *Floyd* hearing. Subsequently, this court granted the parties permission to file supplemental briefs addressing the defendant's claim that the state violated *Brady* by failing to disclose the 2005 internal affairs records.

As a preliminary matter, we examine the contours of the *Brady* claims that the defendant has raised on appeal. In the 2016 motion for augmentation and rectification, the defendant requested that the trial court make the 2008 internal affairs records a part of the record and conduct a *Floyd* hearing. In its decision on the motion, the court entered the 2008 internal affairs records into the record but declined the defendant's request to hold a *Floyd* hearing, concluding that the defendant failed to make out a prima facie showing of a *Brady* violation. The defendant then filed a motion for review, which our Supreme Court denied "without prejudice to the parties addressing in the appellate briefs whether the trial court properly found that the defendant did not meet his burden of proving a violation of [*Brady*]."

On appeal, the defendant presents two alternative claims regarding the 2008 internal affairs records. First, he claims that the state violated *Brady* by failing to disclose the 2008 internal affairs records, and, thus, he is entitled to a new trial. Apparently acknowledging that the trial court never adjudicated the specific issue of whether the state's nondisclosure of the 2008 internal affairs records constituted a *Brady* violation, as the court's ruling on the 2016 motion for augmentation and rectification was limited to entering the 2008 internal affairs records into the record and determining that the defendant had failed to produce prima facie evidence of a *Brady* violation to warrant a *Floyd* hearing, the defendant requests that we review this unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), now that the 2008 internal affairs records are a part of the record. In the alternative, the defendant argues, if we were to determine that the record is inadequate to review this unpreserved *Brady* claim, we should conclude that the trial court erred in denying his request for a *Floyd* hearing and, thus, remand the matter to the trial court to hold a *Floyd* hearing with regard to the 2008 internal affairs records.

With respect to the 2005 internal affairs records, in the 2018 motion for augmentation and rectification, the

defendant requested that the trial court make the 2005 internal affairs records a part of the record and conduct a *Floyd* hearing. The court granted the motion in that it made the 2005 internal affairs records a part of the record; however, the court did not expressly rule on the defendant's request for a *Floyd* hearing. The defendant requested permission to file supplemental briefs on the issue of whether the state's nondisclosure of the 2005 internal affairs records constituted a *Brady* violation, which this court granted.

On appeal, the defendant asserts that the state violated *Brady* by failing to disclose the 2005 internal affairs records, and, therefore, he is entitled to a new trial. Seemingly recognizing that the trial court did not adjudicate the specific issue of whether the state committed a *Brady* violation by failing to disclose the 2005 internal affairs records, as the court's ruling on the 2018 motion for augmentation and rectification was limited to making the 2005 internal affairs records a part of the record, the defendant requests that we review this claim pursuant to *Golding*, as the 2005 internal affairs records are now a part of the record. He does not present an alternate claim asserting that a *Floyd* hearing with regard to the 2005 internal affairs records is necessary.

With respect to the 2008 internal affairs records, we conclude that no additional proceedings under *Floyd* are necessary. Accordingly, pursuant to *Golding*, we proceed to examine the defendant's unpreserved claims that the state committed *Brady* violations by failing to disclose the 2008 internal affairs records and the 2005 internal affairs records. See *State* v. *McCoy*, 331 Conn. 561, 598, 206 A.3d 725 (2019) (observing that unpreserved *Brady* claims have been subject to *Golding* review); see also *State* v. *Bethea*, 187 Conn. App. 263, 281–82, 202 A.3d 429 (conducting *Golding* review of unpreserved *Brady* claim), cert. denied, 332 Conn. 904, 208 A.3d 1239 (2019).

Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40. "The first two steps in the *Golding* analysis address the reviewability of the claim, while the last two steps involve the merits of the claim." (Internal quotation marks omitted.) *State* v. *Jerrell R.*, 187 Conn. App. 537, 543, 202 A.3d 1044, cert. denied,

331 Conn. 918, 204 A.3d 1160 (2019).

With respect to the first prong of *Golding*, the record is adequate for our review of the defendant's *Brady* claims because the 2008 internal affairs records and the 2005 internal affairs records, which the state concedes were not disclosed to the defendant, are part of the record for our review. The second prong of *Golding* is also satisfied, as the defendant's *Brady* claims are "of constitutional magnitude, alleging the violation of a fundamental right to due process. See *Gaskin* v. *Commissioner of Correction*, 183 Conn. App. 496, 530, 193 A.3d 625 (2018) ('[t]he *Brady* rule is based on the requirement of due process' . . .)." *State* v. *Bethea*, supra, 187 Conn. App. 281. Although the defendant's *Brady* claims are reviewable, we conclude that the 2008 internal affairs records and the 2005 internal affairs records were not material under *Brady*, and, thus, the *Brady* claims fail under the third prong of *Golding*.

"As set forth by the United States Supreme Court in *Brady* v. *Maryland*, supra, 373 U.S. 87, [t]o establish a *Brady* violation, the [defendant] must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the [defendant], and (3) it was material [either to guilt or to punishment]. . . . Whether the [defendant] was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review." (Citation omitted; internal quotation marks omitted.) *Turner* v. *Commissioner of Correction*, 181 Conn. App. 743, 752–53, 187 A.3d 1163 (2018).

The 2008 internal affairs records detail an investigation conducted by the Hartford Police Department in 2007 into allegations that Early had (1) arbitrarily or abusively used his police powers in a personal dispute or affair in June, 2007, when he requested that a towing company waive or reduce the fee for the release of his personal vehicle, which had been towed as a result of an expired parking permit, and (2) made false statements in interviews conducted during the course of the investigation regarding who had driven him to the towing company to retrieve his personal vehicle. An internal affairs sergeant sustained both allegations against Early. Early was issued a written reprimand for arbitrarily or abusively using his police powers, but he was not disciplined for making the false statements, as it did not appear that Early made the statements to mislead the investigation.

The 2005 internal affairs records describe an investigation conducted by the Hartford Police Department in 2005 into an incident involving Early, in which Early, while employed in a private services capacity at a Walmart in July, 2005, grabbed a citizen by the neck and shouted profanities at him after having told the citizen to dispose of a cigarette that the citizen had thrown or spat on the ground nearby. Early did not document or

notify his supervisor of the incident. In relation to the incident, Early was charged with (1) intentionally, unnecessarily, and excessively using force in effectuating an arrest or in the performance and execution of official duties, and (2) intentionally using rude, offensive, or profane language and/or behavior toward a citizen while on duty. An internal affairs sergeant sustained both allegations against Early. The 2005 internal affairs records do not reveal whether Early was disciplined in relation to the sustained allegations.

In the present case, the state concedes that it did not disclose the 2008 internal affairs records or the 2005 internal affairs records to the defendant, and, thus, our inquiry becomes whether the records were favorable and material under *Brady*. Assuming, without deciding, that the 2008 internal affairs records and the 2005 internal affairs records were favorable to the defendant as impeachment evidence against Early, we conclude that the records were not material to the outcome of the defendant's trial, and, thus, the state's nondisclosure of the records did not run afoul of *Brady*. See *State* v. *Esposito*, 235 Conn. 802, 815, 670 A.2d 301 (1996) (for purposes of *Brady* analysis, declining to determine whether suppressed evidence was favorable in light of conclusion that suppressed evidence was not material).

"Not every failure by the state to disclose favorable evidence rises to the level of a *Brady* violation. Indeed, a prosecutor's failure to disclose favorable evidence will constitute a violation of *Brady* only if the evidence is found to be material. The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial . . . . *United States* v. *Bagley*, [473 U.S. 667, 675, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)]. In a classic *Brady* case, involving the state's inadvertent failure to disclose favorable evidence, the evidence will be deemed material only if there would be a reasonable probability of a different result if the evidence had been disclosed. *Bagley*'s touchstone of materiality is a reasonable probability of a different result, and the adjective [reasonable] is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." (Internal quotation marks omitted.) *Gaskin* v. *Commissioner of Correction*, supra, 183 Conn. App. 529–30. "In evaluating the reasonable probability stan-

dard, we should be aware of what adverse effect the nondisclosure may have had on the defendant's preparation or presentation of his case and that we should act with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have [otherwise] taken . . . . On the other hand, we must also recognize that the mere *possibility* that an item of undisclosed evidence *might* have helped the defense or *might* have affected the outcome of the trial, however, does not establish materiality in the constitutional sense." (Emphasis in original; internal quotation marks omitted.) *Small* v. *State*, 143 Conn. App. 655, 664, 70 A.3d 180 (2013), cert. denied, 311 Conn. 908, 83 A.3d 1163 (2014).

Although we do not countenance the state's failure to disclose the 2008 internal affairs records and the 2005 internal affairs records, we conclude that there is no reasonable probability that the outcome of the defendant's trial would have been different had the state disclosed either set of the records to the defendant. Even if the defendant could have used the records to impeach Early's credibility, there was overwhelming evidence adduced at trial supporting the defendant's conviction, namely, Lewis' testimony that, prior to the victim's murder, the defendant asked him to fix the .44 Ruger, which, according to Minto's testimony, the defendant and Hall-Davis fixed before the victim's murder; the testimony of the victim's father indicating that the defendant and Hall-Davis had left his cookout together at about dusk on the day before the victim's murder; Walker's testimony that, approximately two hours before the victim's murder, the defendant, accompanied by Hall-Davis, met with Walker at the eventual crime scene, told Walker that he was having "problems" with the victim as a result of her pregnancy and wanted to kill the victim, and requested that Walker act as a lookout for him and provide a false statement to the police officers responding to the crime scene; and Minto's testimony that Hall-Davis told him that Hall-Davis had killed the victim after the defendant had repeatedly pleaded with Hall-Davis to commit the crime in order to terminate the victim's pregnancy, that Hall-Davis used the .44 Ruger to kill the victim, and that, shortly after the Manchester robbery, Hall-Davis disposed of the shell casing from the bullet that was fired at the victim. See *Elsey* v. *Commissioner of Correction*, 126 Conn. App. 144, 160, 10 A.3d 578 ("[T]his was not a case in which the prosecution's case hinge[d] entirely on the testimony of [the witness in question] . . . . Rather . . . there was ample evidence to support the [defendant's] conviction. . . . Therefore, we cannot say that the fact that the state did not disclose the evidence . . . undermines our confidence in the jury's verdict . . . ." [Citations omitted; internal quotation marks omitted.]), cert. denied, 300 Conn. 922, 14 A.3d 1007 (2011).

The defendant asserts that Early's testimony "served as the bridge between the vacillating and self-serving statements of criminals/cooperating witnesses, Minto and Walker, and a more credible basis upon which to find guilt," such that impeaching Early's testimony with the 2008 internal affairs records and the 2005 internal affairs records would have raised doubts about the reliability of the testimonies elicited from Minto and Walker. We are not persuaded. With respect to Minto, Early testified that Minto gave him information that aided him in securing arrest warrants for the defendant and Hall-Davis in relation to the victim's murder; however, we are not convinced that impeaching Early's credibility with the records would have impacted the jury's consideration of Minto's testimony, which directly implicated the defendant in the victim's murder.

With regard to Walker, on direct examination by the state, Walker testified that on May 20, 2013, he gave a statement to the police in relation to the victim's murder. On cross-examination, Walker testified that he went to the police station to give his statement, which was documented by Early, after his landlord had told him that "the police [were] going to kick down my door if [he] didn't come down [to the police station]." Specifically, according to Walker, the landlord identified Early as the officer who had come searching for Walker. Walker also testified that he had offered testimony as a witness in a prior, unrelated criminal case in which Early was the lead investigator. The defendant contends that the findings in the 2008 internal affairs records and the 2005 internal affairs records "would have raised serious questions about the reliability of Walker's account. If the testimony against the defendant was the product of police coercion or 'abuse of authority,' it was more suspect than the jury was led to believe." We find that argument unavailing. Walker's testimony concerning the circumstances surrounding the May 20, 2013 statement that he gave to Early supplied the defendant with evidence upon which to argue to the jury that Walker's testimony was unreliable. In fact, during closing arguments, defense counsel called Walker's credibility into question by arguing, inter alia, that the evidence suggested that Walker had been coerced by the police. Impeaching Early with the 2008 internal affairs records and the 2005 internal affairs records to call into question Walker's credibility on that particular point would have been cumulative. Furthermore, we are unconvinced that Walker's testimony was incredible on the basis that he felt compelled to speak with the police, where there is no indication that his testimony was tainted as a result of his interactions with the police.[24]

In sum, we conclude that the 2008 internal affairs records and the 2005 internal affairs records were not material to the outcome of the defendant's trial, and,

thus, the state's nondisclosure of the records did not constitute *Brady* violations. Accordingly, the defendant's *Brady* claims fail to satisfy the third prong of *Golding*.[25]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant appealed to our Supreme Court pursuant to General Statutes § 51-199 (b) (3). On September 15, 2017, the appeal was transferred to this court pursuant to Practice Book § 65-1.

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[3] General Statutes § 53a-8, which defines accessorial liability, provides in relevant part: "(a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. . . ."

[4] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[5] The defendant recited a similar version of events to two other police officers who had been dispatched to respond to the reported shooting.

[6] The substance of Hall-Davis' conversation with Early was not admitted into evidence.

[7] At some point, Early also arrested Hall-Davis, who had already been arrested in connection with the Manchester robbery at the time.

[8] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[9] With respect to the victim's murder, Hall-Davis was charged with murder in violation of § 53a-54a (a), conspiracy to commit murder in violation of §§ 53a-48 (a) and 53a-54a (a), and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). Following a separate jury trial, Hall-Davis was found guilty on all three counts and sentenced to a total effective sentence of seventy years of incarceration. On appeal, this court affirmed Hall-Davis' judgment of conviction. See *State* v. *Hall-Davis*, 177 Conn. App. 211, 242, 172 A.3d 222, cert. denied, 327 Conn. 987, 175 A.3d 43 (2017).

[10] As a preliminary matter, the state argues that we should not review the defendant's claim that portions of Hall-Davis' statements were blame-shifting and, thus, not against his penal interest because the defendant failed to raise that claim before the trial court. Upon our review of the record, we conclude that the defendant sufficiently raised this claim at trial, and, therefore, it is properly preserved.

[11] We observe that, relative to Hall-Davis' statements proffered by the state during its offer of proof, the statements made by Hall-Davis that were admitted into evidence by way of Minto's testimony more strongly demonstrated that the statements were against Hall-Davis' penal interest. The state proffered that Minto would testify that the defendant had "kept pressuring" Hall-Davis to kill the victim and that Hall-Davis felt that "he needed" to kill the victim, given his close friendship with the defendant. By comparison, Minto testified that the defendant had "kept pleading" with Hall-Davis to kill the victim and that Hall-Davis felt "obliged" to kill the victim, given the assistance that the defendant had provided Hall-Davis while he had been incarcerated.

[12] To the extent that Hall-Davis' personal knowledge is relevant, Hall-Davis understood the legal implications of his statements regarding the victim's murder, as he indicated that he trusted Minto not to share his confession with anyone else. See *State* v. *Camacho*, supra, 282 Conn. 360–61 (concluding that statements were against declarant's penal interest where statements were not blame-shifting and declarant understood legal ramifications of statements); *State* v. *Rivera*, supra, 268 Conn. 368–69 (same); *State* v. *Azevedo*, supra, 178 Conn. App. 688 (same).

[13] Because we conclude that Hall-Davis' statements in their entirety were against Hall-Davis' penal interest, we are not faced with a situation in which a declarant's hearsay statements were only partially self-inculpatory. See, e.g., *State* v. *Rivera*, supra, 268 Conn. 371 n.18 ("We previously have stated

that, under our evidentiary law, 'where the disserving parts of a statement are intertwined with self-serving parts, it is more prudential to admit the entire statement and let the trier of fact assess its evidentiary quality in the complete context.' *State* v. *Bryant*, 202 Conn. 676, 696–97, 523 A.2d 451 [1987]; but see *Williamson* v. *United States*, 512 U.S. 594, 600–601, 114 S. Ct. 2431, 129 L. Ed. 2d 476 [1994] [rule 804 (b) (3) of Federal Rules of Evidence 'does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory'].").

[14] There is no dispute on appeal that Hall-Davis was unavailable to testify as a witness in the defendant's criminal trial as a result of Hall-Davis' invocation of his fifth amendment privilege against self-incrimination. *State* v. *Pierre*, supra, 277 Conn. 68 n.10 ("[d]ue to [declarant's] decision to exercise his fifth amendment right against self-incrimination, it is undisputed that he was unavailable at trial").

[15] We also note that Hall-Davis made the statements in Minto's home, and that Hall-Davis was neither under arrest nor facing arrest at that time. As our Supreme Court has observed, statements made in a "noncoercive atmosphere to a person with whom [the declarant] had a close relationship . . . are significantly more trustworthy than statements obtained by government agents for the purpose of creating evidence that would be useful at a future trial. . . . In short, neither facing arrest nor being under arrest when making his statements to [the witness], [the declarant] lacked the obvious incentive to shift blame or curry favor with the police." (Internal quotation marks omitted.) *State* v. *Camacho*, supra, 282 Conn. 362.

[16] We note that, in overruling the defendant's objection to the admission of Hall-Davis' hearsay statements to Minto, the court determined that the statements were nontestimonial in nature. On appeal, the defendant does not contest that determination and does not claim a violation of his rights under the confrontation clause of the sixth amendment to the United States constitution. See *State* v. *Hutton*, 188 Conn. App. 481, 501 n.10, 205 A.3d 637 (2019) ("[h]earsay statements that are nontestimonial in nature do not implicate the confrontation clause; rather, their admissibility is governed solely by the rules of evidence").

[17] See *Giglio* v. *United States*, 405 U.S. 150, 154–55, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

[18] The substance of the information provided to Early by Minto and Hall-Davis was not admitted into evidence.

[19] The defendant filed the 2016 motion for augmentation and rectification with our Supreme Court, and the motion was forwarded to the trial court for adjudication. See Practice Book § 66-5.

[20] "*Floyd* hearings to explore claims of potential *Brady* violations are ordered pursuant to the appellate courts' supervisory authority under Practice Book § 60-2 . . . . [Appellate courts] will order a *Floyd* hearing to develop a potential *Brady* violation only in the unusual situation in which a defendant was precluded from perfecting the record due to new information obtained after judgment. . . . A *Floyd* hearing is not a license to engage in a posttrial fishing expedition, as the [trial] court will not hold a hearing in the absence of sufficient prima facie evidence, direct or circumstantial, of a *Brady* violation unascertainable at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Ortiz*, 280 Conn. 686, 713 n.17, 911 A.2d 1055 (2006).

[21] At the time that the defendant filed the 2016 motion for augmentation and rectification, defense counsel possessed an internal affairs report that constituted only a portion of the 2008 internal affairs records. During an initial hearing held before the trial court on October 13, 2016, the state offered and the court admitted into evidence, under seal, the entirety of the 2008 internal affairs records. The parties disputed whether, prior to oral argument on the 2016 motion for augmentation and rectification, defense counsel was entitled to access all of the 2008 internal affairs records. By way of a memorandum of decision issued on November 18, 2016, the court denied the request of defense counsel to access the entirety of the 2008 internal affairs records. Prior to the February 23, 2017 hearing, defense counsel acquired a copy of the 2008 internal affairs records in their entirety from a media outlet that had obtained them in response to a Freedom of Information Act request. See General Statutes § 1-200 et seq. The 2008 internal affairs records in toto were admitted into evidence, not under seal, at the February 23, 2017 hearing.

[22] "The trial court's decision with respect to whether to hold a *Floyd* hearing is reviewable by motion for review pursuant to Practice Book § 66-

7 . . . .” *State* v. *Ortiz*, 280 Conn. 686, 713 n.17, 911 A.2d 1055 (2006).

[23] The defendant filed a motion for permission to file the 2018 motion for augmentation and rectification late, which this court granted. The 2018 motion for augmentation and rectification was then forwarded to the trial court for adjudication. See Practice Book § 66-5.

[24] We note that defense counsel did not ask Early any questions regarding his interactions with Walker during the investigation of the victim's murder.

[25] As a final matter, we note that the defendant requests that, in order to help prevent future instances of the state suppressing *Brady* material, we exercise our supervisory authority over the administration of justice to "direct trial courts to conduct a formal inquiry on the record with the prosecutor during pretrial hearings to ascertain whether the state has exercised due diligence in locating favorable evidence, and whether all such information has been disclosed to the defense. This will serve the purpose of creating a record, impressing upon prosecutors the importance of satisfying their disclosure obligations, and reducing the number of *Brady* violations that result from the inadvertent or intentional suppression of favorable evidence." (Footnote omitted.) We decline this invitation.

"Our supervisory powers are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Emphasis in original; internal quotation marks omitted.) *Marquez* v. *Commissioner of Correction*, 330 Conn. 575, 608, 198 A.3d 562 (2019). Under *Brady*, the state has an affirmative obligation to disclose favorable evidence to the defense, including any such evidence held by the state's investigative agencies. See *Demers* v. *State*, 209 Conn. 143, 153, 547 A.2d 28 (1988). Although the state in the present case failed to disclose the records at issue, the defendant does not suggest that the state is failing systematically to comply with *Brady*. Accordingly, we are not convinced that exercising our supervisory authority to establish the procedure sought by the defendant is warranted.